FILED

2012 MAR 26   PM 3: 36

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
SANTA ANA

BY_____

1   ROBBINS UMEDA LLP
    BRIAN J. ROBBINS (190264)
2   brobbins@robbinsumeda.com
    FELIPE J. ARROYO (163803)
3   farroyo@robbinsumeda.com
    KEVIN S. KIM (275200)
4   kkim@robbinsumeda.com
    600 B Street, Suite 1900
5   San Diego, California 92101
    Telephone: (619) 525-3990
6   Facsimile: (619) 525-3991

7   RYAN & MANISKAS, LLP
    KATHARINE M. RYAN
8   kryan@rmclasslaw.com
    RICHARD A. MANISKAS
9   rmaniskas@rmclasslaw.com
    995 Old Eagle School Rd., Suite 311
10  Wayne, PA 19087
    Telephone: (484) 588-5516
11  Facsimile:  (484) 450-2582

12  Attorneys for Plaintiff

13                  UNITED STATES DISTRICT COURT
14                 CENTRAL DISTRICT OF CALIFORNIA
                          SOUTHERN DIVISION
15

16  KEVIN PEHLMAN, Derivatively        )  Case No.   SACV12-00474 DOC (RNBx)
    on Behalf of POWERWAVE             )
17  TECHNOLOGIES, INC.,                )  VERIFIED SHAREHOLDER
                                       )  DERIVATIVE COMPLAINT FOR
18                 Plaintiff,          )  BREACH OF FIDUCIARY
                                       )  DUTIES, WASTE OF
19          v.                         )  CORPORATE ASSETS, AND
                                       )  UNJUST ENRICHMENT
20  RONALD J. BUSCHUR, KEVIN           )
    T. MICHAELS, CARL W. NEUN,         )
21  JOHN L. CLENDENIN, KEN J.          )
    BRADLEY, RICHARD E. BURNS,         )
22  DAVID L. GEORGE, EUGENE L.         )
    GODA, and MOIZ M.                  )
23  BEGUWALA,                          )
                                       )
24                 Defendants,         )
            -and-                      )
25                                     )
    POWERWAVE TECHNOLOGIES,            )
26  INC., a Delaware corporation,      )
                                       )
27                 Nominal Defendant.  )
                                       )  DEMAND FOR JURY TRIAL
28

## NATURE AND SUMMARY OF THE ACTION

1.     Plaintiff, a shareholder of Powerwave Technologies, Inc. ("Powerwave" or the "Company"), brings this derivative action on behalf of the Company against certain officers and directors for breaching their fiduciary duties to the Company by issuing false and misleading public statements. These wrongs resulted in hundreds of millions of dollars in damages to Powerwave's reputation, goodwill, and standing in the business community. Moreover, these actions have exposed the Company to hundreds of millions of dollars in potential liability for violations of state and federal law.

2.     As known by the Individual Defendants (as defined herein), prior to and throughout 2011, certain markets and customers critical to Powerwave's financial success and growth were experiencing the adverse effects of significant economic, regulatory, and political turmoil. For example: (i) in North America, capital expenditures and LTE (long term evolution) spending by AT&T, a large Powerwave customer, softened considerably, primarily as a result of regulatory pressures; (ii) in Europe, the tumultuous economic environment brought capital spending near a halt; and (iii) in the Middle East, geopolitical issues caused a pause in spending by the Company's wireless carrier customers.

3.     The Individual Defendants were acutely aware of these issues and the substantial adverse impact they could have on the Company's financial position and operating results. However, the Individual Defendants provided to investors and analysts alike only vague and misleading information about potential business difficulties, while continuing to tout strong increases in sales and Powerwave's purportedly "excellent position from which to build upon and capture both the short-term and long-term growth opportunities." While making these materially false and misleading statements to the public, the Individual Defendants concealed: (i) the true excessive weakness among its core markets and customers; (ii) the resultant dramatic drop in sales across the Company's product groups; and (iii) the

substantial adverse impact these developments would have on Powerwave's current and future operating results and free cash flows.

4.     By October 18, 2011, however, the Individual Defendants could no longer conceal these material adverse facts.   On that day, Powerwave issued a press release announcing preliminary revenue estimates of $75 million to $79 million for the quarter ended October 2, 2011.   Those results represented a shortcoming of over 50% below analyst estimates, and meant the Company would record its **worst quarterly sales results since 2004**.  In the press release and on a conference call held that same day, Powerwave attributed this shocking development to "weakness in several … markets," comprised of Europe, the Middle East, and North America.

5.     In the wake of the October 18, 2011 disclosure, Powerwave's value plunged to more than 83% below its recent high, erasing over $658 million in market capitalization.

6.     Before disclosing Powerwave's true business health, the Individual Defendants caused the Company to repurchase its own stock at artificially inflated prices.   In July 2011, soon after the Company disclosed some initial signs of weakness that the Individual Defendants dismissed, they authorized and then caused the Company to purchase 2.24 million shares of its own stock at artificially inflated levels, for a total price of approximately $25 million.

7.     As a direct result of defendants' unlawful course of conduct, the Company is now the subject of a federal securities class action lawsuit filed in the U.S. District Court for the Central District of California on behalf of investors who purchased Powerwave shares between February 1, 2011 and October 18, 2011, inclusive (the "Securities Class Action").  The Securities Class Action exposes the Company to potentially hundreds of millions of dollars in damages.

8.     Plaintiff brings this derivative action to: (i) recover damages against the Individual Defendants for the benefit of the Company; and (ii) require the

Company to reform and improve its corporate governance and internal procedures to protect the Company and its shareholders from a repeat of the damaging events described herein.

## JURISDICTION AND VENUE

9.  This Court has jurisdiction over all causes of action asserted herein pursuant to 28 U.S.C. §1332(a) in that plaintiff and defendants are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs. Defendants are citizens of California, Oregon, Florida, and Canada. Plaintiff is not a citizen of any of these states and is not a citizen of a foreign country. This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

10.  This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

11.  Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) because a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to Powerwave, occurred in this District.

## PARTIES

**Plaintiff**

12.  Plaintiff Kevin Pehlman is a current shareholder of Powerwave, was a shareholder of Powerwave at the time of the transactions complained of herein, and has continuously held the stock. Plaintiff is a citizen of Texas.

**Nominal Defendant Powerwave**

13.    Nominal Defendant Powerwave is a Delaware corporation and a global supplier of end-to-end wireless solutions for wireless communications networks.    Powerwave primarily designs, manufactures, markets, and sells products designed to improve coverage, capacity, and data speed in wireless communications networks.    The Company's products include antennas, which account for 47% of its revenues, as well as boosters, combiners, cabinets, shelters, filters, and other related equipment.    Powerwave's principal executive offices are located at 1801 E. St. Andrew Place, Santa Ana, California.

**Individual Defendants**

14.    Defendant Ronald J. Buschur ("Buschur") is Powerwave's Chief Executive Officer ("CEO") and a director and has been since February 2005. Buschur is also Powerwave's President and has been since May 2004.    Buschur was Powerwave's Chief Operating Officer ("COO") from June 2001 to February 2005.    Buschur is named as a defendant in the Securities Class Action complaint that alleges he violated sections 10(b) and 20(a) of the Securities and Exchange Act of 1934 (the "Exchange Act").    Buschur knowingly, recklessly, or with gross negligence made improper statements in the Company's press releases and public filings that concealed: (i) the excessive weakness among the Company's core markets and customers; (ii) the resultant dramatic drop in sales across the Company's product groups; and (iii) the substantial adverse impact these developments would have on Powerwave's current and future operating results and free cash flows.    Buschur also authorized the improper repurchase of Powerwave's shares at artificially inflated prices, causing real economic loss to the Company. Powerwave paid Buschur the following compensation as an executive:

| Year | Salary | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|---------------|----------------------------------------|------------------------|-------|
| 2010 | $600,058 | $2,808,763 | $525,000 | $24,254 | $3,958,075 |

Buschur is a citizen of California.

15.    Defendant Kevin T. Michaels ("Michaels") is Powerwave's Chief
Financial Officer ("CFO") and Secretary and has been since June 1996.  Michaels
was also Powerwave's Senior Vice President, Finance from February 2000 to at
least September 2007 and Vice President, Finance from June 1996 to February
2000.  Michaels is named as a defendant in the Securities Class Action complaint
that alleges he violated sections 10(b) and 20(a) of the Exchange Act.  Michaels
knowingly, recklessly, or with gross negligence made improper statements in the
Company's press releases and public filings that concealed: (i) the excessive
weakness among the Company's core markets and customers; (ii) the resultant
dramatic drop in sales across the Company's product groups; and (iii) the
substantial adverse impact these developments would have on Powerwave's current
and future operating results and free cash flows.  Powerwave paid Michaels the
following compensation as an executive:

| Year | Salary | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|---------------|----------------------------------------|------------------------|-------|
| 2010 | $450,058 | $968,133 | $354,375 | $29,439 | $1,802,005 |

Michaels is a citizen of California.

16.    Defendant Carl W. Neun ("Neun") is Powerwave's Chairman of the
Board of Directors (the "Board") and has been since October 2007 and a director
and has been since February 2000.  Neun is also Chairman of Powerwave's Audit
Committee and has been since at least January 2010.   Neun knowingly or
recklessly made improper statements in the Company's press releases and public
filings that concealed: (i) the excessive weakness among the Company's core
markets and customers; (ii) the resultant dramatic drop in sales across the
Company's product groups; and (iii) the substantial adverse impact these
developments would have on Powerwave's current and future operating results and
free cash flows.  Neun also authorized the improper repurchase of Powerwave's

shares at artificially inflated prices, causing real economic loss to the Company. Powerwave paid Neun the following compensation as a director:

| Fiscal Year | Total |
|---|---|
| 2010 | $150,121 |

Neun is a citizen of Oregon.

17.    Defendant John L. Clendenin ("Clendenin") is a Powerwave director and has been since May 1998.  Clendenin was also Powerwave's Lead Director from February 2005 to October 2007 and Non-Executive Chairman of the Board from January 1999 to February 2005.  Clendenin is a member of Powerwave's Audit Committee and has been since at least January 2010.  Clendenin knowingly or recklessly made improper statements in the Company's press releases and public filings that concealed: (i) the excessive weakness among the Company's core markets and customers; (ii) the resultant dramatic drop in sales across the Company's product groups; and (iii) the substantial adverse impact these developments would have on Powerwave's current and future operating results and free cash flows.    Clendenin also authorized the improper repurchase of Powerwave's shares at artificially inflated prices, causing real economic loss to the Company.  Powerwave paid Clendenin the following compensation as a director:

| Fiscal Year | Total |
|---|---|
| 2010 | $123,795 |

Clendenin is a citizen of Florida.

18.    Defendant Ken J. Bradley ("Bradley") is a Powerwave director and has been since December 2007.  Bradley is also a member of Powerwave's Audit Committee and has been since at least January 2010.  Bradley knowingly or recklessly made improper statements in the Company's press releases and public filings that concealed: (i) the excessive weakness among the Company's core markets and customers; (ii) the resultant dramatic drop in sales across the Company's product groups; and (iii) the substantial adverse impact these developments would have on Powerwave's current and future operating results and

1  free cash flows.  Bradley also authorized the improper repurchase of Powerwave's
2  shares at artificially inflated prices, causing real economic loss to the Company.
3  Powerwave paid Bradley the following compensation as a director:

| Fiscal Year | Total |
|---|---|
| 2010 | $119,770 |

6  Bradley is a citizen of Canada.

7      19.    Defendant Richard E. Burns ("Burns") is a Powerwave director and
8  has been since March 2011.  Burns was also a member of Powerwave's Audit
9  Committee from March 2011 to at least September 2011.  Burns knowingly or
10  recklessly made improper statements in the Company's press releases and public
11  filings that concealed: (i) the excessive weakness among the Company's core
12  markets and customers; (ii) the resultant dramatic drop in sales across the
13  Company's product groups; and (iii) the substantial adverse impact these
14  developments would have on Powerwave's current and future operating results and
15  free cash flows.  Burns also authorized the improper repurchase of Powerwave's
16  shares at artificially inflated prices, causing real economic loss to the Company.
17  Burns is a citizen of Florida.

18      20.    Defendant David L. George ("George") is a Powerwave director and
19  has been since November 1995.  George knowingly or recklessly made improper
20  statements in the Company's press releases and public filings that concealed: (i) the
21  excessive weakness among the Company's core markets and customers; (ii) the
22  resultant dramatic drop in sales across the Company's product groups; and (iii) the
23  substantial adverse impact these developments would have on Powerwave's current
24  and future operating results and free cash flows.  George also authorized the
25  improper repurchase of Powerwave's shares at artificially inflated prices, causing
26  real economic loss to the Company.  Powerwave paid George the following
27  compensation as a director:

28

| Fiscal Year | Total |
|---|---|
| 2010 | $117,795 |

George is a citizen of California.

21.   Defendant Eugene L. Goda ("Goda") is a Powerwave director and has been since November 1995.   Goda knowingly or recklessly made improper statements in the Company's press releases and public filings that concealed: (i) the excessive weakness among the Company's core markets and customers; (ii) the resultant dramatic drop in sales across the Company's product groups; and (iii) the substantial adverse impact these developments would have on Powerwave's current and future operating results and free cash flows.   Goda also authorized the improper repurchase of Powerwave's shares at artificially inflated prices, causing real economic loss to the Company.   Powerwave paid Goda the following compensation as a director:

| Fiscal Year | Total |
|---|---|
| 2010 | $125,295 |

Goda is a citizen of California.

22.   Defendant Moiz M. Beguwala ("Beguwala") is a Powerwave director and has been since December 2007.   Beguwala knowingly or recklessly made improper statements in the Company's press releases and public filings that concealed: (i) the excessive weakness among the Company's core markets and customers; (ii) the resultant dramatic drop in sales across the Company's product groups; and (iii) the substantial adverse impact these developments would have on Powerwave's current and future operating results and free cash flows.   Beguwala also authorized the improper repurchase of Powerwave's shares at artificially inflated prices, causing real economic loss to the Company.   Powerwave paid Beguwala the following compensation as a director:

| Fiscal Year | Total |
|---|---|
| 2010 | $125,295 |

Beguwala is a citizen of California.

23.    The defendants identified in ¶¶14-15 are referred to herein as the "Officer Defendants."    The defendants identified in ¶¶14, 16-22 are referred to herein as the "Director Defendants."    The defendants identified in ¶¶16-19 are referred to herein as the "Audit Committee Defendants."    Collectively, the defendants identified in ¶¶14-22 are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

**Fiduciary Duties**

24.    By reason of their positions as officers, directors and/or fiduciaries of Powerwave, and because of their ability to control the business and corporate affairs of Powerwave, the Individual Defendants owed the Company and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Powerwave in a fair, just, honest, and equitable manner.    The Individual Defendants were and are required to act in furtherance of the best interests of Powerwave and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

25.    Each director and officer of the Company owes to Powerwave and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.    In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, performance, management, projections, and forecasts so that the market price of the Company's stock would be based on truthful and accurate information.

**Additional Duties of the Audit Committee Defendants**

26.    In addition to these duties, the Audit Committee Defendants owed specific duties to Powerwave, under the Audit Committee's Charter, in fulfilling the Board's oversight responsibilities with respect to the Company's corporate accounting and financial reporting processes, the systems of internal control over financial reporting and audits of financial statements, and the quality and integrity of the Company's financial statements and reports.    In particular, the Audit Committee's Charter provided that the Audit Committee Defendants had the duty to, among other things:

- Oversee the accounting and financial reporting processes of the Company and audits of the financial statements of the Company;

- Assist the Board in oversight and monitoring of (i) the integrity of the Company's financial statements, (ii) the Company's compliance with legal and regulatory requirements, (iii) the independent auditor's qualifications, independence and performance, and (iv) the Company's internal accounting and financial controls;

* * *

- Review[] and discuss[] with management and the independent auditors the annual audited financial statements and quarterly unaudited financial statements, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," prior to filing the Company's Annual Report on Form 10-K and Quarterly Reports on Form 10-Q, respectively, with the [U.S. Securities and Exchange Commission ("SEC")]; [and]

* * *

- Review[] before release the unaudited quarterly operating results in the Company's quarterly earnings release[.]

**Control, Access, and Authority**

27.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Powerwave, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Powerwave.

28.    Because of their advisory, executive, managerial, and directorial positions with Powerwave, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and improper representations of Powerwave, including information regarding the impact on the Company's sales of macroeconomic weaknesses in Powerwave's core markets and spending pauses by major customers.

29.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Powerwave, and was at all times acting within the course and scope of such agency.

**Reasonable and Prudent Supervision**

30.    To discharge their duties, the officers and directors of Powerwave were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Powerwave were required to, among other things:

(a)    ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

(b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results;

(d)    remain informed as to how Powerwave conducted its operations and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws; and

(e)    ensure that Powerwave was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

**Ethics and Business Conduct Policy**

31.    The Company also has in place a Code of Business Conduct and Ethics (the "Code"). The Code applies to "[a]ll Company employees and members of the Board of Directors." It demands that the Company, its employees, and the Board conduct business in "strict compliance with all local, state, federal, foreign and other applicable laws, rules and regulations." With respect to SEC filings and public disclosures, the Code also states:

> The Company is required by applicable laws and regulations of the Securities and Exchange Commission to file reports and documents with the Securities and Exchange Commission and also, from time to time, makes public communications. All documents or reports that the Company files with or submits to the Securities and Exchange Commission or related public communications shall comply with all applicable laws and regulations, shall be full, fair, accurate, and understandable and shall be timely filed or communicated.

## BREACHES OF DUTIES

32.    Each Individual Defendant, by virtue of his position as a director and/or officer, owed to the Company and its shareholders the fiduciary duty of loyalty and good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use

and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of Powerwave, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders, which the Individual Defendants were aware, or were reckless in not being aware, posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and/or directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised all of Powerwave's Board.

33. The Individual Defendants breached their duty of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company to make improper statements about the Company's business and financial results and outlook. In particular, these statements concerned the Company's surge in revenue and the demand for the Company's products and services, and failed to adequately address the dramatically weakening sales in Powerwave's core markets and to its primary customers. Further, the Individual Defendants caused Powerwave to spend $25 million to repurchase 2.24 million of the Company's own shares while its stock price was artificially inflated as a result of defendants' improper statements. The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions. As a result of defendants' illegal actions and course of conduct, the Company is now the subject of a class action lawsuit that alleges violations of securities laws, and Powerwave has expended, and will continue to expend, significant sums of money.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

34. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of

their wrongdoing.  The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

35.    During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did conceal the true operating condition of the Company.  In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

36.    The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct.  The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) disguise the Individual Defendants' violations of law, including breaches of fiduciary duties; and (ii) disguise the Company's future business prospects.

37.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully or recklessly release improper statements.  This conspiracy, common enterprise, and/or common course of conduct was furthered by the Individual Defendants when they authorized and caused the Company to repurchase its own shares at artificially inflated prices.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

38.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commissions of the wrongdoing complained of herein, each of the Individual Defendants acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his overall contribution to and furtherance of the wrongdoing.

## SUBSTANTIVE ALLEGATIONS

**Company Background**

39.    Powerwave designs, manufactures, and markets products for wireless communications networks, including antennas, boosters, combiners, cabinets, shelters, filters, radio frequency power amplifiers, remote radio head transceivers, repeaters, tower-mounted amplifiers, and advanced coverage solutions.    The Company's products are used by major wireless carriers worldwide to support all major wireless network protocols and frequencies, including Next Generation Networks in 4G technology, such as LTE and WiMAX.

40.    The Company's sales are derived both inside and outside of the United States, with foreign sales comprising a majority of Powerwave's business.    For the fiscal year ended January 1, 2012, foreign sales represented 56% of the Company's total sales, including 25% in Europe.    Powerwave sells its products both to original equipment manufacturers, who construct base stations which are then sold to wireless network operators, and directly to wireless network operators for incorporation in their existing wireless networks.

41.    Powerwave typically relies on a handful of large customers to garner the vast majority of its sales, including some individual customers that each account for more than 10% of the Company's annual sales.    For the most recent fiscal year, for example, Nokia Siemens Networks, Team Alliance, a North American reseller, and Raycom, a European reseller, accounted for 16%, 16%, and 11% of Powerwave's sales, respectively.    The Company also names among its clients leading wireless companies from around the globe such as AT&T, T-Mobile, Alcatel-Lucent, Huawei, and Ericsson, among others.

**Extreme Economic, Political, and Regulatory Turbulence Affects the Company's Core Markets and Customers**

42.    While the Company's presence in territories around the globe provides a degree of diversity in its sales, it also exposes Powerwave to a wide variety of risks that could adversely impact the business.    Further, the concentration of the

Company's sales in a small group of large customers poses additional risks. Indeed, the Individual Defendants were well aware of these risks as Powerwave disclosed in its filings with the SEC that factors such as "political or civil turmoil" and "worldwide economic conditions [that have] significantly deteriorated" could have a "negative impact on [the Company's] cash position, liquidity and financial condition." And, further, as a result of Powerwave's small number of customers, the Company recognized that:

> [T]he loss of any one or more of these customers, or a significant loss, reduction or rescheduling of orders from any of these customers, would have a material adverse effect on our business, financial condition and results of operations.

43.     For Powerwave, conditions consistent with these risks were reaching a boiling point by early 2011. In Europe, the sovereign debt crisis that first surfaced in Greece in October 2009, renewed in the winter of 2010 and spring of 2011. Loans made in spring 2010 to Greece, Ireland, and Portugal, combined with the effects of the austerity measures demanded of those countries, drove them deeper into recession.  By early 2011, Greece's debt load had actually increased, governments in Ireland and Portugal were being forced out, and with unemployment holding steady at 20%, there was increased unrest in Spain.

44.     By summer of 2011, contagion fears had returned in earnest. It was clear that Greece would need another large bailout as the country was on the path to running out of cash by August 2011. Italy and Spain began experiencing steep increases in the interest rates on its borrowings.  Growth was stalling and even reversing across the European continent, so much so that in August 2011, official figures were released that showed that growth in Europe had fallen to its lowest rate in two years. These factors would combine to create an uncertain economic environment where most capital spending would essentially grind to a halt.

45.     Meanwhile, the Middle East was engulfed in a crisis of a different sort. By March 2011, political and social unrest had escalated to violence. In all

corners of the Middle East, from Egypt to Syria to Yemen, anti-government protests were met with reported brutality by government forces. As governments and leaders were overthrown, violent uprisings spread and capital investment came to a halt. Notably, Powerwave had numerous ongoing projects throughout the Middle East that would be affected by these developments, including several large projects concentrated in Egypt, which was experiencing one of the most severe uprisings in the region.

46.    In the United States, two of Powerwave's significant customers, AT&T and T-Mobile, were embroiled in a losing battle of their own. Ever since the two companies had announced in March 2011 that AT&T agreed to acquire T-Mobile for approximately $39 billion, competitors and consumer groups had been protesting the deal and the U.S. Department of Justice ("DOJ") and the Federal Communications Commission ("FCC") were scrutinizing it for antitrust concerns. The antitrust risk was significant, according to analyst Jonathan Chaplin at Credit Suisse, who wrote shortly after the deal was announced that he had "never seen a deal with more regulatory risk be attempted in the U.S." Sprint, who vehemently opposed the deal from the start, asked the federal government in March to block the deal and, by May 2011, had filed a formal protest with the FCC.

47.    These significant and well-publicized antitrust concerns created uncertainty for the wireless capital investment environment. AT&T recognized that it may need to make concessions to be allowed to complete its acquisition of T-Mobile, which would likely involve the divestiture of wireless network assets. In fact, AT&T began to reduce its capital expenditures on the very products it typically purchased from Powerwave. By the quarter beginning on July 1, 2011, "AT&T's Q3 capex spending was light and [] even LTE spending softened considerably," according to analyst Peter Misek at Jefferies & Company, Inc. Finally, AT&T's fears were realized on August 31, 2011, when the DOJ filed a

- 17 -

lawsuit seeking to prevent the deal due to the harm it would cause to competitiveness in the wireless industry.

48.    Thus, throughout 2011, certain markets and customers critical to Powerwave's financial success and growth were experiencing the adverse effects of significant economic, regulatory, and political turmoil.    In Europe, where the Company garners a quarter of its sales, the tumultuous economic environment brought capital spending near a halt.    In the Middle East, an emerging market for Powerwave, where it was building out several networks in Egypt and other parts of the region, geopolitical issues caused a pause in spending by the Company's wireless carrier customers.    In North America, capital expenditures and LTE spending by AT&T, a large Powerwave customer, softened considerably.

**The Individual Defendants Issue Improper Statements**

49.    In the face of the glaring risks described above, the Director Defendants breached their fiduciary duties by causing and/or allowing the Company to issue improper public statements that did not accurately portray Powerwave's business prospects.    The statements improperly portrayed the Company as being in an "excellent position from which to build upon and capture both the short-term and long-term growth opportunities," when in reality Powerwave was facing extreme revenue risks and experiencing drastically reduced sales.

50.    The improper statements began on February 1, 2011.    On that day, the Company issued a press release detailing its financial results for the fourth quarter and fiscal year ended January 2, 2011.    For the fourth quarter, Powerwave reported net sales of $176 million, an increase of 23% compared to the previous year. Further, the press release quoted defendant Buschur extensively, as Buschur touted the Company's growth and projected "improvement in overall demand."    In particular, the press release stated:

"For the fourth quarter of 2010, we were able to show growth of 23%

- 18 -

over the same period last year and 12% sequentially over the third quarter of this year," stated Ronald J. Buschur, president and chief executive officer of Powerwave Technologies. "More importantly, *we were able to continue our improvements in our operating income for this year*, with the added benefit of demonstrating strong profitability on both a GAAP and pro forma basis for the fourth quarter and year results. We continue to see signs of improvement in overall demand for wireless infrastructure equipment, driven globally by the continued increase in demand for smartphones and the requirements for faster data transmission rates. We are continuing to work *to position Powerwave to capitalize on the long-term growth opportunities we believe are available* within the global wireless infrastructure marketplace."

51.    Also on February 1, 2011, the Company held a conference call on which defendants Buschur and Michaels made additional improper statements about the Company's financial results and its purported position "for continued long-term success."   In the February 1, 2011 press release and during the conference call, however, defendants failed to mention the substantial and growing risks present in Powerwave's key markets and the adverse effect they would have on the Company.  Instead, during the conference call, Buschur stated:

But make no mistakes, we still have some work ahead of us to fully achieve the long-term results that we believe are available to us based on our financial models and plans. We need and *we will continue to grow our core wireless business*, while expanding into additional market segments, such as government sector where we can create true solutions utilizing all of our technology and engineering expertise. With our excellent product portfolio, our superior patent portfolio, the state-of-the-art facilities, and cost effective geographic locations, combined with what we believe are the best personnel across all disciplines, *we have positioned Powerwave for continued long-term success*. I am very excited about the prospects for our business.

52.    On May 5, 2011, defendant Buschur continued to make improper statements on behalf of the Company.  On that day, Powerwave issued a press release detailing financial results for the first quarter of the 2011 fiscal year.  Like

the previous quarter, the Company reported a substantial increase in net sales, this time 19% over the same quarter in the previous year.  In the press release, Buschur continued to make improper statements, stating that Powerwave was now in an "excellent position" for growth and that the Company would meet its sales projections for the year.  Specifically, the press release stated:

> "The first quarter revenue was impacted by delays we encountered ramping up one of our new LTE products," stated Ronald Buschur, President and Chief Executive Officer of Powerwave Technologies. "We believe that we have resolved the production issues that impacted our revenues for the first quarter. Looking ahead for the remainder of this year, we continue to believe that *we are on track for meeting our annual revenue guidance*. There are signs of improving demand for global wireless infrastructure for the remainder of 2011. We believe that *Powerwave is in an excellent position to build upon and capture the long-term growth opportunities that are in the wireless infrastructure marketplace*."

53.    Following the earnings announcement, Powerwave hosted an earnings conference call on which defendants Buschur and Michaels continued to make improper statements.   On the call, Buschur and Michaels improperly touted Powerwave's positioning for "long-term success" that would "generate positive shareholder value," and even highlighted Europe as an important driver of the Company's sales.  Like in the May 5, 2011 press release, however, defendants failed to mention the substantial and growing risks present in Powerwave's key markets and the adverse effect they would have on the Company.  Buschur went so far on the call as to confirm Powerwave's annual sales guidance and, in an unusual step, provide quarterly guidance:

> As Kevin noted, we continue to believe that we will be able to achieve our annual revenue guidance of $650 million to $680 million. As you know, *we typically do not give quarterly guidance, but due to the current results and the fact that we have been seeing an increase in demand for our products, we believe the revenue for Q2 will be between $170 million to $180 million. We are confident that the*

- 20 -

1    *demand should continue to improve throughout this year*.

2    54.    Just over two months later, cracks in the Individual Defendants' story

3    began to show as the Company was forced to preliminarily report sales for the

4    quarter that would likely miss the range previously projected.  However, rather

5    than disclose the truth concerning Powerwave's serious revenue risks and rapidly

6    declining sales, the Individual Defendants continued to conceal those facts.  In a

7    July 12, 2011 press release entitled "Powerwave Technologies Provides Second

8    Quarter Update and Conference Call Information," the Company reported that

9    revenues for the second quarter would "be in the range of $168 million to $172

10   million," as compared to the $170 million to $180 million range announced in

11   May.    Defendant Buschur, however, continued to assure investors that the

12   Company was "in an excellent position" and would meet its annual revenue

13   guidance:

> "For the second quarter, in spite of some slowness in several of our
> markets, we were able to increase revenues by over 24 percent from
> the first quarter of this year and achieve the anticipated revenue
> range," stated Ronald Buschur, President and Chief Executive Officer
> of Powerwave Technologies. "Looking ahead for the remainder of this
> year, *we continue to believe that we are on track for meeting the
> bottom range of our 2011 annual revenue guidance of $650 million
> to $680 million*. We continue to believe that *Powerwave is in an
> excellent position to build upon and capture the long-term growth
> opportunities that are in the wireless infrastructure marketplace*."

21   55.    Then, on August 4, 2011, the Individual Defendants caused

22   Powerwave to issue a press release announcing second quarter 2011 financial

23   results.  The press release reported sales for the quarter of $170.6 million, an 18%

24   increase over the prior year.  While defendant Buschur finally acknowledged the

25   existence of global macroeconomic issues, he continued to tout the Company's

26   revenue growth and "excellent position" for "short-term and long-term growth."

27   Specifically, the press release stated:

> "For the second quarter, we were able to grow our revenues by 25%

sequentially from the first quarter of this year, and by 18% when compared to the same period last year," stated Ronald Buschur, president and chief executive officer of Powerwave Technologies. "In addition, we were able to show improvement in our gross margins during the quarter while continuing to control our operating expenses, thereby driving strong profitability on both a GAAP and pro forma basis for the second quarter. While we are concerned about global macro economic issues, we continue to believe that *we have positioned Powerwave to be in an excellent position from which to build upon and capture both the short-term and long-term growth opportunities that are in the global wireless infrastructure marketplace*."

56.    After releasing its financial results on August 4, 2011, Powerwave held a conference to discuss its second quarter 2011 results, during which defendant Buschur also falsely represented that the Company was still on track to meet its annual revenue guidance, stating the following:

As Kevin mentioned, in July, we refinanced our outstanding 1.875% subordinated convertible note with a private placement of $100 million of 2.75% senior subordinated convertible note which has a first put date of 2018, which we believe should address any concerns around our balance sheet that may have existed. In addition, we repurchased 11.2 million shares of our common stock. We continue to believe that *we will be able to achieve our annual revenue guidance of $650 million to 680 million for 2011*. I believe that *we are well positioning this Company for both short-term and long-term success, which should generate positive shareholder value*. Our strategy focused on driving our sales towards integrative products and solutions which provide higher gross margins will continue had to have a positive effect on our business.

### REASONS THE STATEMENTS WERE IMPROPER

57.    The statements referenced above were each improper when made because they failed to disclose and misrepresented the following material, adverse facts, which the Individual Defendants knew, consciously disregarded, or were reckless in not knowing:

(a)    they failed to highlight the severe revenue risks the Company was facing and the drastic reduction in sales it was experiencing as a result of:

i.    considerable softening in capital expenditures and LTE spending by AT&T, a large Powerwave customer, in the Company's U.S. business;

ii.    significant sales declines in Europe due to the tumultuous economic environment that brought capital spending near a halt; and

iii.    a pause in spending by Powerwave's customers in the Middle East due to severe geopolitical issues;

(b)    for the above reasons, Powerwave would not be able to meet its annual revenue guidance;

(c)    the Company was rapidly burning through free cash flow as a result of the decreasing revenues; and

(d)    as a result of the foregoing, the Individual Defendants lacked a reasonable basis for their positive statements about the Company, its operations, and revenues.

### THE TRUTH EMERGES

58.    On October 18, 2011, Powerwave finally revealed the true problems facing its business.  In a press release entitled "Powerwave Technologies Provides Third Quarter Update and Conference Call Information," the Company announced that *sales for the quarter would fall drastically to between $75 million and $79 million, a $100 million shortfall from what the market was anticipating*.  The press release attributed this disastrous plummet in sales to a number of factors, all of which the Individual Defendants had already known, or were reckless in not knowing, would significantly hamper Powerwave's sales:

Our third quarter revenues were impacted by several factors, which included a significant slowdown in spending by North American network operators, a significant reduction in activity with our original equipment manufacturing customers, coupled with *further weakness in several international markets, including Western and Eastern Europe*, and the Middle East, stated Ronald Buschur, President and Chief Executive Officer of Powerwave Technologies. From a global perspective, *we believe that the current economic environment has*

*caused operators to reduce or postpone their spending plans for the
near term while they evaluate the macro-economic pressures in each
individual market. The Middle East market has been significantly
impacted by the political unrest* throughout the region. In addition, *in
the North American market we believe that the uncertainty arising
from the government's recent opposition to the proposed merger of
AT&T and T-Mobile, has led to delays in spending* as these operators
re-evaluate their capital spending plans. All of these factors, combined
together, have had a significant impact on our third quarter revenues.
While near term visibility remains difficult in our markets, we
continue to believe that the long-term demand for improvements in
wireless infrastructure remain strong, as global demand for data
continues and wireless network operators continue to promote their
plans to improve existing coverage and add additional capacity, in the
form of 4G capabilities, to wireless networks across the globe. We
believe that Powerwave remains positioned to build upon and capture
the long-term growth opportunities that are in the wireless
infrastructure marketplace.

59.    On this news, Powerwave's market value plunged to more than 83%
below its relevant period high, erasing over $658 million in market capitalization.

60.    As the stock price reaction to the revelation of the truth was swift and
damaging, so too were the reactions of analysts covering Powerwave's stock.
Within a day of the Company's announcement, numerous analysts reacted with
shock and dismay at the news.

61.    On October 19, 2011, analysts with WJB Capital Group issued a
report titled "PWAV Q3 Pre-Announcement: Fell Off a Cliff; Downgrading to
Hold." In the report, the analysts wrote "Q3 Revenue Was Really Bad," and
lamented that the Company's management had given them a different sense,
consistent with the Individual Defendants' improper statements above.
Specifically, the report stated:

*When we met with PWAV management in August, we had the sense
that business was difficult but not excessively weak.* We maintained
our Buy rating, believing that the industry was in a soft patch but
ultimately capex cuts would be less likely to affect wireless networks.
However, last night *PWAV negatively pre-announced with weakness*

*noticeable in North America, Eastern Europe, and the Middle East.* We believe the majority of the spending will return, but, with visibility extremely low and timing uncertain, *we are downgrading our rating to Hold and lowering our 2011/2012 estimates and price target*.

62.    Also on October 19, 2011, analyst Steven J. O'Brien with JPMorgan Securities LLC published a report titled "Q3 Revenue Fell Substantially Below Our Estimate; Cutting Forecasts for Considerably Lower Demand." As a result of Powerwave's "dramatic slowdown," the analyst reduced short and long-term forecasts and stated that the Company:

> Negatively preannounced Q3 2011 revenue of $75-79M fell 54% against our prior $168M estimate, down 55% q/q and 51% y/y *on a dramatic slowdown, more like a stoppage, in wireless carrier customers' spending*. Management cited reduced sales to AT&T and T-Mobile in the U.S. as well as weakness in Eastern Europe and the Middle East. With the operating structure geared to far higher demand *we expect earnings to turn negative in the current and upcoming quarters*.

63.    Then, on November 1, 2011, Powerwave officially released financial results for the third quarter of 2011 that confirmed the devastating preannouncement of two weeks earlier. In a stark reversal of the lofty projections offered throughout the relevant period, defendant Buschur reported that Powerwave had suffered from a struggling global economic environment and that "near term visibility remains difficult." The press release stated:

> "As we have previously reported, *our third quarter revenues were impacted by several factors, which included significant slowdowns in several of our markets, including North America, Western and Eastern Europe and the Middle East, as well as our original equipment manufacturing customers*," stated Ronald Buschur, president and chief executive officer of Powerwave Technologies. "From a global perspective, we believe that the current economic environment has caused operators to reduce or postpone their spending plans for the near term while they evaluate the macro-economic pressures in each individual market. While *near term visibility remains difficult in our markets*, we continue to believe that

the long-term demand for improvements in wireless infrastructure remain strong, as global demand for data continues and wireless network operators continue to promote their plans to improve existing coverage and add additional capacity, in the form of 4G capabilities, to wireless networks across the globe. We are currently finalizing our restructuring plans in order to take the steps we believe necessary to maintain Powerwave's competitive position and continue to position Powerwave for long-term success."

## THE IMPROPER REPURCHASES

64.     While the Individual Defendants made improper statements that had the effect of inflating the Company's stock price, they caused Powerwave to repurchase its own stock at these artificially inflated prices. The Individual Defendants are responsible for allowing the Company to waste its capital by repurchasing its own stock at artificially inflated prices.  Despite knowing, or recklessly disregarding, the fact that the value of the Company was artificially inflated, these defendants directed the Company to materially overpay for its own stock through the repurchases detailed herein.

65.     Specifically, in July 2011, the Board authorized and the Individual Defendants caused the Company to repurchase 2.24 million shares of its stock at an aggregate cost to the Company of approximately $25 million.   Under the Individual Defendants' purview, the Company bought back its shares at an average price of $11.15 per share.  Tellingly, the average repurchase price was substantially higher than Powerwave's share price of $4.25 after the truth was revealed on October 18, 2011.[1]  This repurchase was not made pursuant to any publicly announced plan; rather, it was a one-off action made with funds that the Company had only recently raised through a debt issuance.   Thus, the repurchase was approved and effected by the Individual Defendants during the relevant period, while they knew, or were recklessly disregarding, the fact that Powerwave's stock

---

[1] All Powerwave share prices referenced herein reflect a one for five reverse stock split on October 31, 2011.

price was artificially inflated. As the previously artificially inflated Company stock precipitously dropped to represent the true value of Powerwave, the Company incurred real economic loss arising from the approximately $25 million spent to repurchase its own shares at inflated prices.

## DAMAGES TO POWERWAVE

66. As a result of the Individual Defendants' wrongful conduct, Powerwave disseminated improper, public statements concerning its revenue and business prospects. These improper statements have devastated Powerwave's credibility as reflected by the Company's over $658 million, or 83%, market capitalization loss.

67. Further, as a direct and proximate result of the Individual Defendants' actions, Powerwave has expended, and will continue to expend, significant sums of money. Such expenditures include, but are not limited to:

(a)  costs incurred from defending and paying any settlement in the class action for violations of federal securities laws;

(b)  costs incurred from compensation and benefits paid to the defendants who have breached their duties to Powerwave; and

(c)  costs incurred from repurchasing $25 million of the Company's stock at artificially inflated prices.

68. Moreover, these actions have irreparably damaged Powerwave's corporate image and goodwill. For at least the foreseeable future, Powerwave will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Powerwave's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

69. Plaintiff brings this action derivatively in the right and for the benefit of Powerwave to redress injuries suffered, and to be suffered, by Powerwave as a

direct result of breach of fiduciary duties, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants. Powerwave is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

70.    Plaintiff will adequately and fairly represent the interests of Powerwave in enforcing and prosecuting its rights.

71.    Plaintiff was a shareholder of Powerwave at the time of the wrongdoing of which plaintiff complains and has continuously held stock in the Company at all relevant times.

72.    The Board of Powerwave currently consists of the following eight individuals: defendants Buschur, Beguwala, Bradley, Burns, Clendenin, George, Goda, and Neun. Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

**Demand Is Excused Because the Individual Defendants Face a Substantial Likelihood of Liability for Their Misconduct with Respect to Powerwave's Improper Public Statements and Financial Reporting**

73.    Defendants Bradley, Burns, Clendenin, and Neun, the Audit Committee Defendants, had a heightened responsibility under the Audit Committee Charter for reviewing and approving quarterly and annual financial statements, earnings press releases, and Powerwave's accounting and financial reporting processes. Despite these duties, Audit Committee Defendants Bradley, Burns, Clendenin, and Neun, allowed the Individual Defendants to issue improper statements about the Company's operations and financial prospects. They knew the Company's statements were improper as a result of: (i) their access to and review of internal corporate documents; (ii) conversations and connections with other corporate officers, employees, and directors; and (iii) attendance at management and Board meetings. These improper public statements concealed: (i)

the excessive weakness among the Company's core markets and customers; (ii) the resultant dramatic drop in sales across the Company's product groups; and (iii) the substantial adverse impact these developments would have on Powerwave's current and future operating results and free cash flows.  They also authorized and/or permitted the issuance of various improper statements and are principal beneficiaries of the wrongdoing alleged herein.  Thus, they could not fairly and fully prosecute such a suit even if such suit was instituted by them.  Thus, they face a sufficiently substantial likelihood of liability for their breach of fiduciary duties, rendering any demand upon them futile.

74.    Defendants Buschur, Beguwala, Bradley, Burns, Clendenin, George, Goda, and Neun all face a substantial likelihood of liability due to their breaches of their duty of loyalty and wasting the Company's assets in authorizing and permitting the inexplicable repurchase of approximately $25 million worth of the Company's stock at artificially inflated prices.  At the time of the repurchase authorizations, Buschur, Beguwala, Bradley, Burns, Clendenin, George, Goda, and Neun either knew, or in reckless disregard for their duties did not know, that the Company's stock price was inflated as a result of the improper statements detailed herein.

75.    Defendants Buschur, Beguwala, Bradley, Burns, Clendenin, George, Goda, and Neun all face a substantial likelihood of liability for breaching their duty of loyalty.  These defendants were either informed of the serious risks facing the Company's primary sources of revenues and Powerwave's already steeply declining sales or were consciously violating their duty to stay informed about the core business of the Company.  Despite this knowledge, Buschur, Beguwala, Bradley, Burns, Clendenin, George, Goda, and Neun failed to act to disclose the true state of the Company's business and instead made and/or approved improper public statements that concealed: (i) the excessive weakness among the Company's core markets and customers; (ii) the resultant dramatic drop in sales across the

Company's product groups; and (iii) the substantial adverse impact these developments would have on Powerwave's current and future operating results and free cash flows.  Such a decision could not have been an action taken in good faith. Furthermore, Buschur, Beguwala, Bradley, Burns, Clendenin, George, Goda, and Neun's conscious failure to act in the face of the overwhelming risks and rapidly diminishing sales is a breach of their duty of loyalty, which subjects them to a substantial likelihood of liability.  Therefore, demand is excused.

76.    Moreover, the acts complained of constitute violations of the fiduciary duties owed by Powerwave's officers and directors and these acts are incapable of ratification.

77.    Each of the Director Defendants of Powerwave authorized and/or permitted the improper statements disseminated directly to the public or made directly to securities analysts and which were made available and distributed to shareholders, authorized and/or permitted the issuance of various of the improper statements, and are principal beneficiaries of the wrongdoing alleged herein and thus, could not fairly and fully prosecute such a suit even if such suit was instituted by them.

78.    Powerwave has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Individual Defendants and current Board have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Powerwave any part of the damages Powerwave suffered and will suffer thereby.

79.    If Powerwave's current and past officers and directors are protected against personal liability for their acts of mismanagement and breach of fiduciary duty alleged in this Complaint by directors and officers' liability insurance, they caused the Company to purchase that insurance for their protection with corporate funds, i.e., monies belonging to the stockholders of Powerwave.  However, the directors and officers' liability insurance policies covering the defendants in this

case contain provisions that eliminate coverage for any action brought directly by Powerwave against these defendants, known as the "insured versus insured exclusion." As a result, if these directors were to cause Powerwave to sue themselves or certain of the officers of Powerwave, there would be no directors and officers' insurance protection and thus, this is a further reason why they will not bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery. If there is no directors and officers' liability insurance, then the current directors will not cause Powerwave to sue the defendants named herein, since they will face a large uninsured liability and lose the ability to recover for the Company from the insurance.

80. Moreover, despite the Individual Defendants having knowledge of the claims and causes of action raised by plaintiff, the current Board has failed and refused to seek to recover for Powerwave for any of the wrongdoing alleged by plaintiff herein.

81. Plaintiff has not made any demand on the other shareholders of Powerwave to institute this action since such demand would be a futile and useless act for at least the following reasons:

(a) Powerwave is a publicly held company with over 31.7 million shares outstanding and thousands of shareholders;

(b) making demand on such a number of shareholders would be impossible for plaintiff who has no way of finding out the names, addresses, or phone numbers of shareholders; and

(c) making demand on all shareholders would force plaintiff to incur excessive expenses, assuming all shareholders could be individually identified.

# COUNT I

## Against the Individual Defendants for Breach of Fiduciary Duties

82.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

83.     Defendants owed and owe Powerwave fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe Powerwave the highest obligation of good faith, fair dealing, loyalty, due care, reasonable inquiry, oversight, and supervision.

84.     The Individual Defendants violated and breached their fiduciary duties of good faith, fair dealing, loyalty, due care, reasonable inquiry, oversight and supervision.

85.     The Individual Defendants knowingly or recklessly approved the issuance of false statements that misrepresented and failed to disclose material information concerning: (i) the excessive weakness among the Company's core markets and customers; (ii) the resultant dramatic drop in sales across the Company's product groups; and (iii) the substantial adverse impact these developments would have on Powerwave's current and future operating results and free cash flows.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

86.     The Individual Defendants also approved and caused the Company to repurchase $25 million of its own stock at prices that were artificially inflated as a result of the Individual Defendants' improper statements described herein.

87.     As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Powerwave has sustained significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

88.     Plaintiff, on behalf of Powerwave, has no adequate remedy at law.

## COUNT II

### Against the Individual Defendants for Corporate Waste

89.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

90.     The wrongful conduct alleged regarding the issuance of false and misleading statements, was continuous, connected, and on-going throughout the applicable time period.  It resulted in continuous, connected, and on-going harm to the Company.

91.     As a result of the misconduct described above, the Individual Defendants wasted corporate assets by: (i) causing the Company to repurchase $25 million of its own shares at artificially inflated prices; and (ii) paying bonus and non-equity incentive compensation to certain executive officers.

92.     As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

93.     Plaintiff, on behalf of Powerwave, has no adequate remedy at law.

## COUNT III

### Against the Individual Defendants for Unjust Enrichment

94.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

95.     By their wrongful acts and omission, Individual Defendants were unjustly enriched at the expense of and to the detriment of Powerwave.

96.     The Individual Defendants were unjustly enriched as a result of the compensation they received while breaching their fiduciary duties owed to Powerwave.

97.     Plaintiff, as shareholder and representative of Powerwave, seeks restitution from the Individual Defendants and seeks an order from this Court

disgorging all profits, benefits, and other compensation obtained by the Individual
Defendants from their wrongful conduct and fiduciary breaches.

98.    Plaintiff, on behalf of Powerwave, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Against all the Individual Defendants for the amount of damages
sustained by the Company as a result of the Individual Defendants' breach of
fiduciary duties, aiding and abetting of breach of fiduciary duties, corporate waste,
and unjust enrichment;

B.    Directing Powerwave to take all necessary actions to reform and
improve its corporate governance and internal procedures to comply with
applicable laws and to protect Powerwave and its shareholders from a repeat of the
damaging events described herein, including, but not limited to, putting forward
for shareholder vote resolutions for amendments to the Company's By-Laws or
Articles of Incorporation and taking such other action as may be necessary to place
before shareholders for a vote the following Corporate Governance Policies:

1.    a proposal to strengthen the Board's supervision of the
Company's financial reporting process;

2.    a proposal to strengthen the Board's supervision of operations
and develop and implement procedures for greater shareholder input into the
policies and guidelines of the Board;

3.    a provision to permit the shareholders of Powerwave to
nominate at least two candidates for election to the Board;

4.    a proposal to ensure the accuracy of the qualifications of
Powerwave's directors, executives, and other employees;

5.    a proposal to strengthen the Company's procedures for the
receipt, retention, and treatment of complaints received by the Company regarding
accounting, internal controls, and auditing matters; and

1       6.    a provision to appropriately test and then strengthen the internal

2 audit and control functions;

3       C.    Awarding to Powerwave restitution from the Individual Defendants,

4 and each of them, and ordering disgorgement of all profits, benefits, and other

5 compensation obtained by the Individual Defendants;

6       D.    Awarding to plaintiff the costs and disbursements of the action,

7 including reasonable attorneys' fees, accountants' and experts' fees, costs, and

8 expenses; and

9       E.    Granting such other and further relief as the Court deems just and

10 proper.

11 **JURY DEMAND**

12     Plaintiff demands a trial by jury.

13 Dated: March 26, 2012        ROBBINS UMEDA LLP

14                       BRIAN J. ROBBINS
                      FELIPE J. ARROYO

15                       KEVIN S. KIM

16

17                       BRIAN J. ROBBINS

18                       600 B Street, Suite 1900
                      San Diego, California 92101

19                       Telephone: (619) 525-3990
                      Facsimile: (619) 525-3991

20                       E-Mail: brobbins@robbinsumeda.com
                      farroyo@robbinsumeda.com

21                       kkim@robbinsumeda.com

22                       RYAN & MANISKAS, LLP
                      KATHARINE M. RYAN

23                       RICHARD A. MANISKAS
                      995 Old Eagle School Rd., Suite 311

24                       Wayne, PA 19087
                      Telephone: (484) 588-5516

25                       Facsimile: (484) 450-2582

26                       E-Mail: kryan@rmclasslaw.com
                      rmaniskas@rmclasslaw.com

27                       Attorneys for Plaintiff

28 708771

## VERIFICATION

I, Kevin Pehlman, under penalty of perjury, state as follows:

I am the Plaintiff in the above-captioned action.  I have read the foregoing Complaint and authorized its filing.  Based upon the investigation of my counsel, the allegations in the Complaint are true to the best of my knowledge, information and belief.


DATED: _3-23-12_____                              _____
                                                                      Kevin Pehlman

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

# NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge David O. Carter and the assigned discovery Magistrate Judge is Robert N. Block.

The case number on all documents filed with the Court should read as follows:

## SACV12- 474 DOC (RNBx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

==========================================================

## NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

[ ]  **Western Division**
312 N. Spring St., Rm. G-8
Los Angeles, CA 90012

[X]  **Southern Division**
411 West Fourth St., Rm. 1-053
Santa Ana, CA 92701-4516

[ ]  **Eastern Division**
3470 Twelfth St., Rm. 134
Riverside, CA 92501

Failure to file at the proper location will result in your documents being returned to you.

CV-18 (03/06)      NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

Name & Address:
Brian J. Robbins (190264)
ROBBINS UMEDA LLP
600 B Street, Suite 1900
San Diego, CA 92101

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| KEVIN PEHLMAN, Derivatively on Behalf of POWERWAVE TECHNOLOGIES, INC. | CASE NUMBER |
|---|---|
| PLAINTIFF(S) | **SACV12-00474 DOC (RNBx)** |
| v. | |
| RONALD J. BUSCHUR, KEVIN T. MICHAELS, CARL W. NEUN, JOHN L. CLENDENIN, KEN J. BRADLEY, (see Attachment A) | **SUMMONS** |
| DEFENDANT(S). | |

TO:    DEFENDANT(S):

A lawsuit has been filed against you.

Within __21__ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff's attorney, Brian J. Robbins _____, whose address is ROBBINS UMEDA LLP, 600 B Street, Suite 1900, San Diego, CA 92101 _____. If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

MAR 26 2012

Dated: _____

Clerk, U.S. District Court

AMY DeAVILA

By: _____
     Deputy Clerk

*(Seal of the Court)*

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States. Allowed 60 days by Rule 12(a)(3)].*

## ATTACHMENT A

RICHARD E. BURNS, DAVID L. GEORGE, EUGENE L. GODA, and MOIZ M.
BEGUWALA,

                Defendants,

-and-

POWERWAVE TECHNOLOGIES, INC., a Delaware corporation,

        Nominal Defendant.

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

| I (a) PLAINTIFFS (Check box if you are representing yourself ☐)<br>KEVIN PEHLMAN, Derivatively on Behalf of POWERWAVE TECHNOLOGIES, INC. | DEFENDANTS<br>RONALD J. BUSCHUR, KEVIN T. MICHAELS, CARL W. NEUN, JOHN L. CLENDENIN, KEN J. BRADLEY, RICHARD E. BURNS, DAVID L. GEORGE, EUGENE L. GODA, MOIZ M. BEGUWALA, et al. |
|---|---|
| (b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)<br>Brian J. Robbins, ROBBINS UMEDA LLP, 600 B. Street, Suite 1900, San Diego, CA 92101; (619) 525-3990 | Attorneys (If Known) |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ I U.S. Government Plaintiff

☐ 2 U.S. Government Defendant

☐ 3 Federal Question (U.S. Government Not a Party)

☑ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☑ 4 |
| Citizen of Another State | ☑ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☑ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify):
☐ 6 Multi-District Litigation
☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☑ Yes ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☐ Yes ☑ No

☐ **MONEY DEMANDED IN COMPLAINT: $**

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
28 U.S.C. §1332(a); Shareholder Derivative Complaint for Breach of Fiduciary Duties, Waste of Corporate Assets, and Unjust Enrichment

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 530 General | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 535 Death Penalty | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 540 Mandamus/ Other | ☐ 740 Railway Labor Act |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | BANKRUPTCY | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | ☐ 151 Medicare Act | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | FORFEITURE / PENALTY | PROPERTY RIGHTS |
| ☐ 490 Cable/Sat TV | | ☐ 355 Motor Vehicle Product Liability | CIVIL RIGHTS | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 810 Selective Service | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 850 Securities/Commodities/ Exchange | | ☐ 362 Personal Injury- Med Malpractice | ☐ 442 Employment | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 875 Customer Challenge 12 USC 3410 | ☑ 160 Stockholders' Suits | ☐ 365 Personal Injury- Product Liability | ☐ 443 Housing/Acco- mmodations | ☐ 630 Liquor Laws | SOCIAL SECURITY |
| ☐ 890 Other Statutory Actions | ☐ 190 Other Contract | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | ☐ 640 R.R. & Truck | ☐ 861 HIA (1395ff) |
| ☐ 891 Agricultural Act | ☐ 195 Contract Product Liability | | ☐ 445 American with Disabilities - Employment | ☐ 650 Airline Regs | ☐ 862 Black Lung (923) |
| ☐ 892 Economic Stabilization Act | ☐ 196 Franchise | IMMIGRATION | ☐ 446 American with Disabilities - Other | ☐ 660 Occupational Safety /Health | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 893 Environmental Matters | REAL PROPERTY | ☐ 462 Naturalization Application | ☐ 440 Other Civil Rights | ☐ 690 Other | ☐ 864 SSID Title XVI |
| ☐ 894 Energy Allocation Act | ☐ 210 Land Condemnation | ☐ 463 Habeas Corpus- Alien Detainee | | | ☐ 865 RSI (405(g)) |
| ☐ 895 Freedom of Info. Act | ☐ 220 Foreclosure | ☐ 465 Other Immigration Actions | | | FEDERAL TAX SUITS |
| ☐ 900 Appeal of Fee Determi- nation Under Equal Access to Justice | ☐ 230 Rent Lease & Ejectment | | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| | ☐ 240 Torts to Land | | | | ☐ 871 IRS-Third Party 26 USC 7609 |
| ☐ 950 Constitutionality of State Statutes | ☐ 245 Tort Product Liability | | | | |
| | ☐ 290 All Other Real Property | | | | |

**FOR OFFICE USE ONLY:** Case Number: SACV12-474 Doc(RNBx)

**AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.**

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☑ No   ☐ Yes
If yes, list case number(s): _____

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☐ No   ☑ Yes
If yes, list case number(s): 8:12-cv-00222-CJC-JPR, 8:12-cv-00385-CJC-JPR

Civil cases are deemed related if a previously filed case and the present case:
(Check all boxes that apply)   ☑ A. Arise from the same or closely related transactions, happenings, or events; or
☑ B. Call for determination of the same or substantially related or similar questions of law and fact; or
☑ C. For other reasons would entail substantial duplication of labor if heard by different judges; or
☐ D. Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named plaintiff resides.
☐  Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| | Harris County, Texas |

(b)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named defendant resides.
☐  Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Powerwave Technologies, Inc. Moiz M. Beguwala, Ronald J. Buschur, David L. George, Eugene L. Goda, Kevin T. Michaels (all Orange County) | Ken J. Bradley (Canada resident); Richard E. Burns (Leon County, FL), John L. Clendenin (Palm Beach County, FL), Carl W. Neun (Clackamas County, OR) |

(c)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH claim arose.
Note: In land condemnation cases, use the location of the tract of land involved.

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Orange | |

* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties
Note: In land condemnation cases, use the location of the land involved.

X. SIGNATURE OF ATTORNEY (OR PRO PER): _____   Date March 26, 2012

Notice to Counsel/Parties:  The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |